Bruce H. Nagel, Esq.
**NAGEL RICE, LLP**
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
bnagel@nagelrice.com
*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMY BLOCK, VICTORYA MANAKIN, JENNIFER FEMATT, AND CRYSTAL HUNTER on behalf of themselves and the Putative Class, <br><br>                Plaintiffs, <br><br>     vs. <br><br> JAGUAR LAND ROVER NORTH AMERICA, LLC, <br><br>             Defendant. | Case No.: 2:15-cv-05957-SRC-CLW |

## SECOND AMENDED COMPLAINT AND JURY DEMAND
### (CLASS ACTION)

Plaintiffs Amy Block (hereinafter "Block"), residing in Livingston, New Jersey, Victorya Manakin, (hereinafter "Manakin"), residing in Westwood, Massachusetts, Jennifer Fematt (hereinafter "Fematt"), residing in Shearman Oaks, California, and Crystal Hunter ("Hunter"), residing in Fort Washington, Maryland (collectively "Plaintiffs"), by and through their undersigned attorneys, Nagel Rice, LLP, on behalf of themselves and all others similarly situated, by way of this Second Amended Complaint, make the following allegations on personal knowledge, information and belief:

## I.   NATURE OF THE ACTION

1.    Plaintiffs bring this action for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits, and all other relief available on behalf of themselves

1

and all similarly-situated individuals (the "Class") and entities who own, lease or have owned or have leased model year 2008 through 2015 Land Rover LR2 vehicles (hereinafter, the "Vehicles") manufactured and/or sold by the Defendant, Jaguar Land Rover North America, LLC (hereinafter, "Land Rover" or "Defendant").

2.     All of the claims asserted herein arise out of Land Rover's design, manufacture, and warranting of the Vehicles, as well as Land Rover's advertising, promoting, marketing, distributing, selling and leasing of the Vehicles as one of the most dependable, safe, and reliable sport utility vehicles available.

3.     One option on the vehicles is an "Infotainment Control Module" (hereinafter, the "ICM"), which includes a navigation system, Bluetooth connectivity, and other informational displays such as the radio, temperature control, and other functionality. Land Rover charges a premium in its vehicles for the ICM, especially those that include a navigation system.

4.     The Vehicles are designed and manufactured with a uniform and inherent design defect that causes the ICM to not properly shut down, which results in the ICM continuing to operate after the vehicle's engine has been shut down, thereby draining the battery.  Specifically, the Vehicles contain a defective electrical system, which causes the ICM to not shut down properly when the ignition is turned off after certain vehicle applications are used,  such as the navigation system or Bluetooth® system, causing the battery to gradually drain until the vehicle cannot be started (hereinafter, the "Defect").

5.     This Defect is inherent in the design and/or manufacture of the Vehicles' electrical system and/or entertainment system, to which no repair by Land Rover has corrected the problem.

6.     As a result of the Defect, the Vehicles do not start as they are designed to do, and the battery needs to be continually replaced. The Defect has also required the Vehicles to undergo numerous service calls, attempted repairs, and upgrades, all of which have failed to correct the

Defect. In addition to the foregoing, as a result of the Defect, Plaintiffs and the other members of the Class have been subject, and continue to be subject, to a serious safety risk, as they cannot ensure that their vehicles will start as they are designed to do, and may be subject to physical harm or other damages when they are unable to start their vehicles.

7.      Land Rover knew, or reasonably should have known, at or before the time it sold the first unit, that the Vehicles contained the Defect and that the Vehicles' batteries would fail prematurely as a direct result of the Defect. Land Rover had sole and exclusive possession of this knowledge at or before the time it sold the first unit, and continues to remain in sole and exclusive possession of virtually all information regarding the Defect.

8.      Notwithstanding this knowledge, Land Rover misrepresented that the Vehicles were reliable and free from defects, which Land Rover knew to be untrue, both at the time of sale or lease and on an ongoing basis. The Defect exposes drivers and occupants of the Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

9.      Land Rover also concealed, and failed to disclose the Defect, both at the time of sale or lease of the Vehicles and on an ongoing basis. The Defect exposes drivers and occupants of the Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

10.     At all times, Land Rover made written misrepresentations to, concealed from, and/or failed to disclose to Plaintiffs, the other members of the Class and all others in the chain of distribution, about the Defect, and failed to remove the Vehicles from the marketplace or take appropriate remedial action. Instead, Land Rover sold and serviced the Vehicles, and continues to sell and service the Vehicles, even though it knows and knew, or was reckless in not knowing, that the Vehicles contained the Defect, and that such failure would ultimately result in the inability of Plaintiffs and the other members of the Class to use their vehicles for their intended purpose during

the time Plaintiffs and the other members of the Class reasonably expected they would have use of their vehicles, and subjected Plaintiffs and the other members of the Class to an increased risk of accident, injury, or death.

11.     Land Rover also omitted material information regarding the Defect from its marketing, advertising, sale and lease of the Vehicles.  The Defect exposes drivers and occupants of the Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

12.     At all times, Land Rover omitted from Plaintiffs and the other members of the Class, and all others in the chain of distribution, the existence of the Defect and failed to remove the Vehicles from the marketplace or take appropriate remedial action.  Instead, Land Rover sold and serviced the Vehicles, and continues to sell and service the Vehicles, even though it knows and knew, or was reckless in not knowing, that the Vehicles contained the Defect, and that such Defect would ultimately result in the inability of Plaintiffs and the other members of the Class to use their vehicles for their intended purpose during the time Plaintiffs and the other members of the Class reasonably expected they would have use of their vehicles, and subjected Plaintiffs and the other members of the Class to an increased risk of accident, injury, or death.

13.     The Defect has caused the Vehicles to fail prematurely, whether within or outside of the applicable warranty periods.  Attempted repairs to Plaintiffs' vehicles have continually failed.

14.     Many other owners and lessees of the Vehicles have complained in public forums and to Land Rover dealerships about the Defect and the specific problems it causes, and have requested that Land Rover address and remedy the Defect.

15.     In 2011, in response to mounting complaints and/or information concerning the Defect, Land Rover itself informed its dealerships about the existence of the Defect, and instructed

its dealerships and service shops to perform diagnostic testing on the Vehicles.  Land Rover, however, did not communicate this information to Plaintiffs or the other members of the Class, nor has Land Rover taken any affirmative action in remedying the Defect.

16.     As a direct and proximate consequence of Land Rover's false and misleading statements, and active and ongoing concealment and omission of the Defect, Plaintiffs and the other members of the Class purchased, leased, and currently own or lease defective vehicles and have incurred damages thereby.

17.     Had Plaintiffs and other members of the Class known of the Defect at the time of purchase or lease, they would not have bought or leased their vehicles, or would have paid substantially less for them.

18.     Plaintiffs seek actual damages, injunctive relief, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to Plaintiffs and the Class.

## II.   PARTIES

19.     Plaintiff Amy Block is a New Jersey citizen who resides in Livingston, New Jersey.

20.     Plaintiff Victorya Manakin is a Massachusetts citizen who resides in Westwood, Massachusetts.

21.     Plaintiff Jennifer Fematt is a California citizen who resides in Sherman Oaks, California.

22.     Plaintiff Crystal Hunter is a Maryland citizen who resides in Fort Washington, Maryland.

23.     Defendant Jaguar Land Rover North America, LLC, is a limited liability company, organized and in existence under the laws of the state of New Jersey. Land Rover's corporate

headquarters are located at 555 MacArthur Blvd., Mahwah, New Jersey. Land Rover is the distributor and warrantor of the Vehicles in the United States.

24.     At all relevant times, Defendant was engaged in the business of marketing, advertising, distributing, selling, and warranting automobiles, other motor vehicles and motor vehicle components in New Jersey and throughout the United States of America.

25.     On or about April 20, 2010, Block purchased a new 2009 Land Rover LR2 from Prestige Land Rover in Paramus New Jersey (hereinafter, "Prestige"), a Land Rover authorized dealership, for approximately $32,173.41.

26.     Prior to her purchase of her vehicle, Block spoke with employees of Prestige regarding the vehicle.  The employees of Prestige made representations to her about the vehicle regarding the benefits of the vehicle, including its safety.  They represented to Block that the LR2 was dependable, reliable, and good for any situation.

27.     None of the representations received by Block contained any disclosure relating to the Defect. Had Prestige's employees disclosed the existence of the Defect she would not have purchased the vehicle or would have paid significantly less for the vehicle.

28.     On or about December 18, 2013, less than four years after purchasing the vehicle and within the applicable warranty period, after just a few days of not using her vehicle, Block attempted to start her vehicle. However, the vehicle's ICM system had not shut off, which caused its battery to drain and prevented the vehicle from being able to start.

29.     Accordingly, on or about December 19, 2013, Block serviced her vehicle at Prestige because of error messages found on the ICM display and a dead battery. Prestige informed Block that her vehicle's battery had completely drained, replaced the battery, and charged Block $205.43 for the service visit.

30.     Less than four months later, on or about April 3, 2014, Block's vehicle again failed to start, which required her to call AAA for service. The battery died again on or about April 7, 2014, requiring yet another AAA service call.

31.     Block's battery failed yet again on or about July 8, 2015, requiring yet another AAA service call.

32.     Between September 2014 and November 2014, the battery in Block's vehicle died three more times, requiring Block to call AAA for a jump start each time.

33.     On or about November 17, 2014, Block was forced to again have her vehicle serviced by Prestige because the battery kept dying. Prestige informed Block that her vehicle's battery had completely drained again, and charged Block $142.17 for the service visit.

34.     On or about November 25, 2014, Block had her vehicle again serviced by Prestige, where the Land Rover authorized dealership determined that there was a "possible issue with current software in the [ICM] unit" and cited to a July 14, 2011 Technical Bulletin ("TSB") from Land Rover that specifically admits the Defect, and informs dealerships of its existence. Block paid Prestige $138.03 to diagnose and purportedly repair the faulty battery.[1]

35.     However, less than a month later, on or about December 15, 2014, Block's battery failed yet again and required another AAA call for a jump start.

36.     Finally, on or about April 28, 2015, Block's vehicle died yet again, requiring her to purchase a new battery from AAA.

37.     As such, Block was forced to expend almost $500 to repeatedly have her vehicle repaired, all of which was completely ineffective.

---

[1] The July 14, 2011 Land Rover Technical Bulletin is annexed hereto as Exhibit A.

38.     On or about March 19, 2012, Manakin purchased a 2010 Land Rover LR2 from MetroWest Motorcars, LLC (hereinafter "Metrowest") in Northborough, Massachusetts for $16,062.50.

39.     Manakin purchased her vehicle primarily for personal, family, or household use. Among other things, the safety and reliability of Manakin's vehicle was of paramount importance as Manakin would be using the vehicle for many long distance trips in New England and upstate New York during the winter with her son.

40.     Prior to her purchase of the vehicle at issue, Manakin reviewed Land Rover's website.  Land Rover's website at the time stated that LR2s featured "advanced technologies", "Bluetooth connectivity" and in reference to the infotainment system[2]:

> LR2 offers the latest technology to keep you informed, in touch and entertained. Two high-quality in-car entertainment systems are available, all with MP3 compatibility. Bluetooth® personal telephone integration with compatible mobile phones as well as HD Radio® and Sirius® Satellite Radio. Optional DVD satellite navigation is available via a large, high definition Touch-screen.

41.     Manakin also reviewed Consumer Reports, various Land Rover online forums, and reviewed marketing materials regarding the vehicle.  The LR2 marketing brochure for the 2010 model year touted the vehicles capabilities, safety, and quality.  It stated that the LR2 "employs the latest technology" and that it features "Personal telephone integration of compatible mobile phones is also available via the Bluetooth® hands-free telephone system."[3]

42.     None of the research reviewed by Manakin regarding the vehicle contained any disclosure relating to the Defect.  Manakin relied on Land Rover's misrepresentations and omissions as set forth in paragraphs 40 and 41 in deciding to purchase her vehicle.  Had Land

---

[2] https://web.archive.org/web/20120116145425/http://www.landrover.com/us/en/lr/lr2/explore/lr2/, last visited July 15, 2016.
[3] See Exhibit B, attached hereto.

Rover disclosed that this vehicle actually contained the Defect, Manakin would not have purchased her vehicle, or would have paid significantly less for the vehicle.

43.     On or about December 10, 2012, and within the applicable warranty period, Manakin took her vehicle to Norwood Jaguar/Land Rover in Norwood, Massachusetts (hereinafter "Norwood") because her vehicle was hesitating when it started and sometimes would start only intermittently.   Norwood conducted a complimentary general diagnostic test and found no problems with the vehicle's battery.

44.     The starting problems with Manakin's vehicle, however, were not resolved and required constant monitoring.  For example, on or about April 30, 2013, Manakin had her vehicle serviced by Norwood but again Norwood found no problems with the battery or crank shaft and also confirmed the starter wiring was not impaired.  Norwood did recommend, however, that Manakin unplug her phone's car charger when she is not using the vehicle.  Norwood charged Manakin $92.23 for the service visit.

45.     On or about February 20, 2014, Manakin's vehicle failed to start.  She had her vehicle examined by Extreme Motor Sport, LLC in Waltham, Massachusetts (hereinafter "Extreme"), which noted that her battery had died and the vehicle was unable to start.  Extreme charged Manakin $236.00 to replace the dead battery.

46.     Then, in or about September 2014, Manakin's vehicle once again failed to start and required another service visit by Extreme.  Extreme's diagnostic analysis reported that the charging system on the vehicle was working properly but the vehicle was experiencing an unknown battery drain.

47.     On or about October 6, 2014, Manakin's vehicle failed to start again.  This time, Manakin called Norwood.  Norwood jump started Manakin's vehicle and took it to their service department where they performed a diagnostic test.  The diagnostic test revealed that the battery

had died but Norwood was unable to determine the cause of the repeated battery failure.  Manakin was charged $135.00.

48.     In order to avoid repeatedly calling AAA for service because of her vehicle's Defect, on or about April 23, 2015, Manakin purchased an emergency battery jump pack from Amazon.com for $264.83.

49.     Manakin's vehicle continued to fail to start.  On or about November 10, 2015, Manakin tried to start her vehicle after not using the vehicle for a week, but once again the battery had drained.  Accordingly, Manakin had to have her vehicle serviced once again by Extreme, which noted that the vehicle's battery had died and again performed a diagnostic of the vehicle. The service department did not find any problems with the battery or charging system and charged Manakin $250.75 for the service visit.

50.     To this day, Manakin still experiences the effects of the Defect, including slow and hesitant starting (and sometimes a failure to start), as well as erroneous warning lights concerning the check engine light and low gas indicators.

51.     On or about October 2, 2008, Fematt bought a new 2008 LR2 from Anaheim Jaguar Land Rover ("Anaheim") in Anaheim, California.

52.     Prior to her purchase of her vehicle, Fematt spoke with employees of Anaheim regarding the vehicle.  During these discussions, the employees made representations to Fematt regarding the benefits of the vehicle, including its safety.

53.     None of the representations received by Fematt contained any disclosure relating to the Defect.  Had Land Rover disclosed that this vehicle contained the Defect, Fematt would not have purchased her vehicle, or would have paid significantly less for the vehicle.

54.     Beginning in 2015, Fematt's vehicle began experiencing battery problems.

55.     Specifically, on or about January 31, 2015, Fematt's vehicle failed to start. Fematt called AAA to service her vehicle and was charged $152.60 for a new battery.

56.     Then, only eight months later, on or about August 31, 2015, Fematt's vehicle again failed to start. This time she brought the vehicle to Osborn's Auto repair in Redondo Beach, CA, but the repair shop could not determine what was wrong with the battery. Instead, the repair shop replaced the battery charging Fematt $221.55.

57.     Then, only four months later, on or about December 4, 2015, Fematt's vehicle again failed to start. This time, she took her vehicle to Castle Automotive in Shearman Oaks, CA and paid $20.00 for the labor to replace her failed battery.

58.     Immediately after having her battery replaced for a third time, Fematt took her vehicle to Land Rover of Encino CA on or about December 4, 2015 to have the battery issue inspected. Land Rover of Encino, however, informed Fematt that there were no problems with the vehicle.

59.     In or around August 2011, Hunter bought a pre-owned 2010 LR2 from Land Rover Alexandria ("Alexandria"), for approximately $29,500. Hunter's vehicle was previously used as a Land Rover loaner vehicle.

60.     Prior to her purchase of her vehicle, Hunter spoke to employees of the dealership regarding the vehicle.  The employees of Alexandria made representation to Hunter regarding the benefits of the vehicle, including its safety.  She also asked if there were any issues or problems with the LR2.  No issues or problems were disclosed to her.

61.     None of the representations received by Hunter contained any disclosure relating to the Defect.  Had Land Rover disclosed that this vehicle contained the Defect, Hunter would not have purchased her vehicle, or would have paid significantly less for the vehicle.

62.     At the time Hunter asked whether there were any issues or problems with the LR2, Land Rover had already put out the TSB regarding the problems with the LR2's battery and infotainment system.

63.     Beginning in 2014, Hunter's vehicle began experiencing battery problems.

64.     Specifically, on or about March 13, 2014, Hunter's vehicle failed to start. Hunter eventually got her vehicle repaired at a PepBoys location in Marlow Heights, Maryland and paid $188.14.

65.     Then, approximately eighteen months later, on or about November 30, 2015, Hunter's vehicle again failed to start. She again brought the vehicle to PepBoys who conducted a complimentary battery test and vehicle inspection but could not detect the problem with Hunter's vehicle.

66.     Then, only two months later, on or about January 18, 2016, Hunter's vehicle again failed to start. This time, she took her vehicle to Alexandria and paid $2,926.33 for an inspection and parts, including $1,192.20 for Alexandria to perform diagnostic and other tests as well as replace the alternator, motor and fan, and gasket. While the technicians believed the cause of Hunter's battery drain was related to its cooling fan remaining on, Hunter continues to have battery drain issues even after this repair.

67.     At all times, Plaintiffs and the other members of the Class drove their vehicles in a foreseeable manner, and in the manner in which they were intended to be used.

68.     The Defect was never remedied, and to this day Plaintiffs' vehicles and the Vehicles still suffer from the Defect.

69.     Plaintiffs and the Class have suffered an ascertainable loss as a result of the Defendant's misrepresentations associated with the Defect, including but not limited to, out-of-

pocket losses and diminished value of the vehicles, as well as having paid a premium for the vehicles with certain options that failed to work as advertised.

70. Plaintiffs and the Class have suffered an ascertainable loss as a result of the Defendant's omissions associated with the Defect, including but not limited to, out-of-pocket losses and diminished value of the vehicles, as well as having paid a premium for the vehicles with certain options that failed to work as advertised.

71. Were Plaintiffs and the other members of the Class aware of the misrepresentations, concealments, failures to disclose and omissions described herein, they would not have purchased their vehicles or would have paid significantly less for them.

## III.     .JURISDICTION AND VENUE

72. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), as the Class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendant, and seeks in the aggregate more than Five Million Dollars ($5,000,00.00), exclusive of costs and interest. This Court also has personal jurisdiction over the parties because Defendant conducts substantial business in New Jersey, its corporate headquarters is located in New Jersey, and has had systematic and continuous contacts with New Jersey, and has agents and representatives that can be found in this State.

73. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiff Block and Defendant are residents of this judicial district, a substantial part of the events giving rise to the claims set forth herein occurred and emanated from this district, and Defendant's conduct has injured members of the Class residing in this district. Accordingly, this Court has jurisdiction over this action, and venue is proper in this judicial district.

## IV.    TOLLING OF STATUTE OF LIMITATIONS

74.    Any applicable statute(s) of limitations has been tolled by Land Rover's knowing and active concealment and denial of the facts alleged herein. Despite their due diligence, Plaintiffs and the other members of the Class could not have reasonably discovered the Defect until shortly before this class action litigation was commenced.

75.    Land Rover was and remains under a continuing duty to disclose to Plaintiffs and the other members of the Class the true character, quality and nature of the Defect, that the Defect will require costly repairs, that the Defect is a safety concern, and that the Defect diminishes the resale value of the Vehicles. As a result of the active concealment by Land Rover, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

76.    Moreover, because the Defect could not be detected due to Land Rover's purposefully fraudulent concealment, Plaintiffs and the other members of the Class were not reasonably able to discover the Defect until long after purchasing or leasing the Vehicles, despite their exercise of due diligence. Thus, the discovery rule is applicable to the claims asserted by Plaintiffs and the other members of the Class.

77.    Any applicable statute of limitation has therefore been tolled by Land Rover's knowing, active concealment and denial of the facts alleged herein. Land Rover is estopped from relying on any statutes of limitation because of its concealment of the Defect.

## V.    FACTUAL BACKGROUND

### A.  The Vehicle & The Defect

78.    The Land Rover LR2 is a mid-sized sport utility vehicle that utilizes a monocoque body structure built with body-on-frame designs.

79.    The LR2 is powered by a standard 3.2 liter inline six cylinder engine.

80.     All LR2 vehicles come equipped with an ICM that controls the vehicle's entertainment, climate, navigation, and other electronic processes. The ICM is powered by the LR2's standard car battery.

81.     Land Rover charges a premium for its ICM, especially where the ICM includes a navigation system.

82.     Land Rover designed, manufactured, warranted, promoted, marketed, distributed, sold, and leased the Vehicles. Land Rover sold and leased thousands of Vehicles in New Jersey, Massachusetts, Maryland, California, and nationwide, directly or indirectly, through dealers and other retail outlets.

83.     Land Rover brought the LR2 model year 2008-2015 vehicles to market between 2007 and present, and continued selling and leasing them to members of the Class without disclosing the existence, nature, or scope of the Defect.

84.     Land Rover made misrepresentations to Plaintiffs and the other members of the Class prior to the sale or lease of the Vehicles regarding the reliability and safety of the Vehicles. Land Rover also misrepresented to Plaintiffs and the other members of the Class the existence of the Defect.

85.     Land Rover also concealed, failed to disclose and/or omitted to inform Plaintiffs and the other members of the Class about the existence of the Defect despite their knowledge of it and that the Defect would cause the batteries to drain and prevent the Vehicles from starting.

86.     On July 14, 2011, Land Rover issued a "Technical Bulletin" admitting that the LR2 beginning with model year 2008 suffered from a "Flat Battery" (referred to as the "TSB") . Specifically, Land Rover admitted the following:

> The vehicle's battery may be flat, for no apparent reason, after the vehicle is parked overnight or similar period of non-use. This may be caused by the [ICM] not shutting down correctly if the following conditions occurred at the time of ignition 'OFF' and exiting the vehicle: 1. Customer viewing the

Navigation system map; **and** 2. Customer engaged in an active Bluetooth©
telephone call. If **both** of these conditions are encountered, a quiescent draw
of approximately 1.5 amps on the battery may be induced, leading to the
flat battery situation.

<u>See</u> Exhibit A, attached hereto.

87.    The TSB is designed to provide guidance to Land Rover mechanics and service

personnel with respect to reoccurring problems or issues.  The TSB is not sent to owners or lessees

of the Vehicles.  The TSB was not sent to Plaintiffs or the other members of the Class.

88.    Thus, as explicitly set forth by Land Rover, the Defect causes the ICM to not shut

down if the operator uses either the navigation system or the Bluetooth© system and, therefore,

will continue to drain the battery – even after the vehicle is shut off – until the battery is dead and

the vehicle cannot be restarted.

89.    Accordingly, the Vehicles contain a uniform design defect.

90.    Despite Land Rover's acknowledgment of the Defect in 2011, they failed to notify

owners and lessees of the Vehicles and failed to recall the Vehicles.

91.    Defendants failed to adequately research, design, test, and/or manufacture the

Vehicles before warranting, advertising, promoting, marketing, distributing, selling and leasing

the Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

**B. The Reasonable And Legitimate Expectations Of Plaintiffs And The Members Of The**
**<u>Putative Class</u>**

92.    Customers purchasing or leasing vehicles reasonably and legitimately expect that

those vehicles, like the Vehicles at issue herein, will properly function for years.

93.    In purchasing or leasing their vehicles, Plaintiffs and the other members of the

Class reasonably and legitimately expected their vehicles to be reliable, and to operate in

accordance with all of their intended purposes – including their batteries not draining prematurely.

94.     In purchasing or leasing their vehicles, Plaintiffs and the other members of the Class reasonably and legitimately expected that the Vehicles would be free from the Defect.

95.     The existence of the Defect is a fact that would be considered material to a reasonable consumer deciding whether to purchase or lease a vehicle that was equipped with an electrical and/or entertainment system containing navigation and Bluetooth.

96.     Customers like Plaintiffs and the other members of the Class, reasonably and legitimately expect and assume that a vehicle's electrical system and options will function in their intended manner, will not pose a safety hazard and are free from defects. Plaintiffs and the other members of the Class also reasonably and legitimately expect and assume that Land Rover will not sell or lease vehicles with a known defect, and will disclose any such defects to consumers when they learn of them. It was reasonable and legitimate for Plaintiffs and the other members of the Class to expect Land Rover not to actively and intentionally conceal problems from them – such as the Defect described herein – to continually deny its existence, or that Land Rover would refuse to bear the repair costs that become necessary to correct the problems resulting from the Defect.

97.     Throughout the period that the LR2 was sold and leased, Land Rover marketed, promoted and advertised the Vehicles as dependable under any circumstance, and routinely touted Land Rover's history of providing vehicles that can perform in the harshest environments on earth. Among other things, Land Rover repeatedly and consistently advertised the reliability of the LR2. For example, in certain LR2 brochures, Land Rover boasts that "Despite the probability that you won't. It's designed for the possibility that you will," and that its technology is "advanced."

98.     In fact, Land Rover celebrates the capabilities and history of its vehicles. See http://www.landroverusa.com/our-story/index.html. Specifically, Land Rover promotes its vehicles as those that "inspire[] total confidence whatever the terrain."

99.     In addition, Land Rover advertised the exacting and detailed testing it conducts on its vehicles to ensure that they are free of defects once they are sent to the independent Land Rover dealerships.

100.     Plaintiffs and the other members of the Class reasonably and legitimately expected the Vehicles to work properly.

101.     Plaintiffs and the other members of the Class reasonably and legitimately expected Land Rover to disclose the existence of the Defect that was known to it at the time of sale or lease and that the Vehicles were prone to premature battery draining, dead batteries, and electrical and/or entertainment system malfunctions.

102.     Plaintiffs and the other members of the Class could not have discovered the latent Defect through any reasonable inspection of their vehicles prior to purchase or at any time thereafter.

103.     As a direct and proximate result of the Defect, Plaintiffs' vehicles batteries drained, depleted, and died and needed to be replaced multiple times.

104.     As a direct and proximate result of the Defect, Plaintiffs and the other members of Class have experienced failure of their vehicles, did not receive what they paid for, and have incurred actual damages.

105.     Had Plaintiffs and other members of the Class known about the Defect while they were in the market for purchasing or leasing a vehicle, they would not have purchased or leased the Vehicles or, at the very least, would have paid less for them to account for, among other things, the ongoing need to monitor prior to the Defect becoming manifest, then repairing the Defect once it occurred, and the increased risk of accident, injury or death.

C. **Land Rover's Awareness Of The Defect**

106.    Land Rover was aware of the Defect when it began warranting, advertising, promoting, marketing, distributing, selling and leasing the Vehicles, yet failed to take any remedial action. Rather, Land Rover actively and intentionally concealed and failed to disclose the Defect from Plaintiffs and the other members of the Class at the time of purchase or lease, and thereafter.

107.    Since at least 2007, Land Rover had knowledge of the Defect in the Vehicles.  This knowledge was obtained through Land Rover's pre-manufacturing research and testing, pre-market testing procedures, complaints made to authorized dealers, complaints made directly to Land Rover, complaints made to the National Highway Transportation Safety Administration ("NHTSA"), testing conducted in response to those complaints, warranty and post-warranty claims, replacement part sales data, aggregate data from Land Rover's dealers and other internal sources.  The foregoing includes conducting testing on their vehicles' electrical systems and related components, such as the ICM, to verify that these components are free from defects and comply with Land Rover's design, manufacture and other specifications.

108.    Land Rover also knew, or reasonably should have known, of the Defect based upon the number of complaints it received from its dealerships and service shops. For instance, multiple departments at Land Rover interact with its dealerships and service shops in order to identify potentially widespread vehicle problems, including those related to its vehicles' electrical systems. These Land Rover departments collect and analyze data from the dealerships and service shops in order to identify any problems in its vehicles. Moreover, Land Rover dictates when a repair is made under warranty (or when warranty coverage is requested).  Service shops must provide Land Rover with detailed documentation of the in-warranty problems they encounter and the repair that is utilized, which include descriptions of the associated complaint, cause, and

correction. For their part, dealerships and service shops are meticulous about providing this detailed information about in-warranty repairs to Land Rover because Land Rover will not pay the dealerships and service shops for the repair if sufficient detail is not provided.

109.   Land Rover also actively monitors the internet, including vehicle forums, as well as the NHTSA database to gather data regarding complaints made about Land Rover's vehicles. Further, Land Rover's customer relations division regularly receives and responds to customer calls, emails, and other correspondence concerning, *inter alia*, product defects. Through these sources, Land Rover was made aware, or reasonably should have been made aware, of the Defect.

110.   Numerous customer complaints demonstrate that Land Rover knew, or reasonably should have known, of the problems concerning the Defect, the costs associated with the necessary repairs, and how the defective condition affects its consumers. The following are examples of consumer complaints on the internet that have been posted on various websites, and concern the Defect as it relates to the battery and the electrical and/or entertainment system:

   a. Asked by sdichi Jan 12, 2015 at 04:43 PM about the 2010 Land Rover LR2 HSE
   Question type: Maintenance & Repair
   **I have a 2010 LR2 HSE with 35k miles that I have on-going issues with a flat/dead battery. If I leave the vehicle for a few days and dont drive it, the battery is completely dead - doesn't even turn over.** I have to then get it jumped. Then it's fine until it sits for more than 2 days. I have had the LR dealership tell me the issue is resolved (first a new battery, then a system reboot), neither of which fixed the issue. Am I missing something as to why the dealership can't determine the cause of the battery drain? I'm not very knowledgeable about cars but I've done some research online and it seems like a mechanic should be able to fix this, or at minimum tell me the cause? Any insight would be helpful.
   See   http://www.cargurus.com/Cars/Discussion-t36280_ds630765 (emphasis added)
   b. **Battery drains within 24 hours with no accessories having been left on.** Shop can not find any faults and left vehicle sit for 4 days but could not duplicate. This is not surprising as the problem is transient - this is the second time it has happened.
   See http://www.truedelta.com/Land-Rover-LR2/electrical-problems-754 (emphasis added)

c. mystery battery drain
   **battery just goes dead after sitting a day or two.** was told it could be the alternator. i have checked for battery drain from other sources. any body have any advice.
   See http://www.landroversonly.com/forums/f8/mystery-battery-drain-23237/ (emphasis added)

d. The following is part of a thread on a Land Rover Forum:

   i. Bought **a new LR2 HSE** in October. Less than 1500 miles on it at present. Last night I put the key fob in the slot, foot on the brake, and pushed the engine start button. Rather than starting, the instrument panel had a fit! All the lights came on, and the LCD screen between the tach and the spedo gave a series of error messages - HDC Fault, System Resetting, etc. Then the LCD started acting really weird - it went blank, and then a single horizontal line appeared at the bottom and began to flash. The small LCD where the gear info is located had a big E where the gear numbers would normally be. Then the hazzard lights came on, but not as flashers, just solid on the dash. Outside the car, the wipers started making a slow, jerky motion as they gradually traveled up the windshield - funny, since they were not turned on. The outside turn signals weakly flashed in random patterns. Tried to get the key out, and it wouldn't come out. Then eveything went dead. Not even the overhead light would turn on! Grabbed my other key fob and used the emergency manual key to lock everything up, and I called roadside assistance this morning to have them come get the car. Looks like for all the supposed improvements in Land Rover quality with this new model, they are still using the same idiots to design and install the electrics as they always have.

   Anyone have similar issues?

   ii. Just had similiar situation!!! My **LR2** has 16,000 miles and this past weekend, I went out to start it and NOTHING HAPPENED. The HDC SYSTEM TRANSMISSION DEFAULT message came up on the dash....engine would not turn over or start. Interior lights and horn worked, but that was it. Had to have it towed to dealership....and they still can't figure out how to start the car.The vehicle has never been in an accident and the service advisorsays the 'accident light' is now on in the engine and he can't turn it off.

   iii. **<u>Back in September it went to the dealership for a recall on the navigation and somehow it messed up the electrical</u>**...it stayed at the shop for 3 1/2 weeks...until they finally fixed it. yeah right. Still waiting to hear from the dealership today on the status of the vehicle that I had towed in on Saturday!!!

This is a very common issue, sorry to say. The supposed fix is to reconfigure the <u>body control module</u>, instrument cluster control module, and <u>solar sensor</u>. We had one that was leased by an employee at our store and the downloads did not resolve the issue. The lights and strange behavior are due to low battery voltage. **One or multiple modules stay "awake" and drain the battery down.** I am not terribly impressed by these vehicles, either. Needless to say, the employee was able to get out of her lease and into an Acura.

<u>See</u> http://landroverforums.com/forum/lr2-35/lr2-electrical-meltdown-17942/ (emphasis added)

iv. **I have a 2009 LR LR2 with 83,000 miles. I'm very happy with the truck but while I was away (3 days) I came home to a very dead battery.** All accessories were off, nothing in auto mode with the security on. I had to use the manual method to get in, pop the hood and charge the battery. After an hour the truck started and everything is back to normal. As a daily driver all is good but that is not always the case. Any ideas on a source of the drain? I don't have navigation **but it is set up for blue tooth, no codes showing up either.** Software issue? HELP!

v. For the fifth time I have come home to a dead **LR2**. I have changed batteries. I have asked <u>the dealer</u> to upload the software changes recommended in this topic discussion by LR2driver. I unpaired my cell phone. Any other suggestions? Bosalls5, how is you car working? Thnx!

vi. So I had a very similar issue today. Fit perfectly with the cause. Brought it in and it looked like the software update had already been done. **They ate charging the battery and I guess I just wont use Bluetooth anymore.**

vii. Hmm... I haven't run my LR2 in about 4 days and now I go to take it to work and my battery is dead!!!!! I just got the battery last year. I'm hoping it is a software upgrade.

<u>See</u>  http://landroverforums.com/forum/lr2-35/battery-drain-69983/ (emphasis added)

111.    Based on these and other complaints, Land Rover knew, or reasonably should have known, of the Defect at the time it sold or leased the Vehicles, and the potential danger it posed to consumers.

112.    Based upon all the foregoing, Land Rover was aware of the Defect when it began warranting, advertising, promoting, marketing, distributing, selling and leasing the Vehicles, yet failed to take any remedial action.

113.     Yet, despite all of the foregoing, Land Rover has refused to address and rectify the Defect, and has failed and refused to reimburse its customers for the monies they were forced to expend, and are continually forced to expend, as a direct and proximate result of the Defect.  Land Rover has failed to implement a plan to address the Defect, and has instead manufactured, warranted, advertised, promoted, marketed, distributed, sold and leased subsequent models that contain the same or substantially similar Defect, which they actively and intentionally concealed.

114.     Buyers, lessees and other owners of the Vehicles were without access to the information concealed by Land Rover as described herein, and therefore reasonably relied on Land Rover's representations and warranties regarding the quality, durability, and other material characteristics of the Vehicles. Had these buyers and lessees not been purposely deceived by Land Rover regarding their vehicles and the known defects within them, Plaintiffs and the other members of the Class would have paid less for their vehicles than the amounts they actually paid, or would not have purchased the vehicles at all.

### D.  <u>Land Rover's Warranty</u>

115.     Land Rover issued warranties to each owner or lessee of the Vehicles.

116.     Under these warranties, Land Rover agreed to repair defects reported within four years or 50,000 miles.

117.     Land Rover instructs owners and lessees to bring their Vehicles to a Land Rover dealership for warranty repairs.

118.     Many owners and lessees have presented the Vehicles to Land Rover dealerships with complaints related to the Defect. Land Rover has evaded its warranty obligations by failing to inform owners and lessees of the Vehicles of the existence of the Defect.

119.     Owners and lessees of the Vehicles have incurred, and will continue to incur, expenses for the diagnosis and repair of the Defect, despite such defect having been contained in the Vehicles when manufactured, distributed, advertised, marketed, and warranted by Land Rover.

## VI.     CLASS ACTION ALLEGATIONS

120.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively, the "Classes"):

**The Nationwide Class**

All persons or entities in the United States who own, lease, or have owned or have leased, a 2008 to 2015 Land Rover LR2 and/or any other Land Rover model containing the Defect.

**The New Jersey Subclass**

All persons or entities in the State of New Jersey who own, lease, or have owned or have leased, a 2008 to 2015 Land Rover LR2 and/or any other Land Rover model containing the Defect.

**The California Subclass**

All persons or entities in the state of California who own, lease, or have owned or have leased, a 2008 to 2015 Land Rover LR2 and/or any other Land Rover model containing the Defect.

**The Massachusetts Subclass**

All persons or entities in the state of Massachusetts who own, lease, or have owned or have leased, a 2008 to 2015 Land Rover LR2 and/or any other Land Rover model containing the Defect.

**The Maryland Subclass**

All persons or entities in the state of Maryland who own, lease, or have owned or have leased, a 2008 to 2015 Land Rover LR2 and/or any other Land Rover model containing the Defect.

121.    Excluded from the Classes are: (a) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors that purchased the Vehicles; (b) the judge to whom this case is assigned and any member of the judge's immediate family; and (c) individuals with claims for personal injury, wrongful death and/or emotional distress.

122.    **Numerosity/Impracticability of Joinder**: The members of the Class are so numerous that joinder of all members would be impracticable. The Class is believed to include tens of thousands of members. The Class is composed of an easily ascertainable, self-identifying set of individuals and entities that own, lease or owned and leased the Vehicles.  The precise number of Class members can be ascertained by reviewing documents in Defendant's possession, custody, and control.

123.    **Commonality and Predominance**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, include, but are not limited to, the following:

    a.    Whether the Vehicles suffer from the Defect;

    b.    Whether the defective nature of the battery, entertainment and/or electrical systems constitutes a material fact;

    c.    Whether Land Rover knew, or reasonably should have known, that the Vehicles were defectively designed, manufactured, marketed, distributed, advertised, warranted, sold and leased;

    d.    Whether Land Rover knew or reasonably should have known of the defects relating to the battery drain and the electrical and/or entertainment systems before it sold and leased the Vehicles to Plaintiffs and the other members of the Class;

e. Whether Land Rover had a duty to disclose the Defect to Plaintiffs and the other members of the Class;

f. Whether Land Rover actively and intentionally misrepresented, concealed, failed to disclose and/or omitted material information in its marketing, advertising, sale and lease of the Vehicles concerning the existence of the Defect;

g. Whether Plaintiffs and the other members of the Class are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

h. Whether Land Rover should be declared financially responsible for notifying all members of the Class of the Defect in the Vehicles, and for the costs and expenses of repairing and/or replacing the defective battery, and the electrical and/or entertainment systems;

i. Whether Land Rover is obligated to inform members of the Class of their right to seek reimbursement for having paid to diagnose, repair and/or replace their battery, and the electrical and/or entertainment systems due to the Defect;

j. Whether Land Rover violated the consumer protection laws in the New Jersey Consumer Fraud Act (hereinafter, the "CFA"), N.J.S.A. 56:8-1, et seq., in the California Unfair Competition Law (hereinafter, the "UCL"), Cal. Bus. & Prof. Code § 17200 et seq., in the California Consumer Legal Remedies Act (hereinafter, the "CLRA"), Cal. Civ. Code § 1750 et seq., in the Maryland Consumer Protection Act (hereinafter, the "MD CPA"), and in the Massachusetts Consumer Protection Law (hereinafter, the "MA CPL"), Mass. Gen. L. 93A.

k. Whether Land Rover's conduct violates warranty laws, and other laws as asserted herein;

l. Whether, as a result of Land Rover's omissions, concealments and/or misrepresentations of material facts related to the Defect, Plaintiffs and the other members of the Class have suffered ascertainable losses, and whether Plaintiffs and the other members of the Class are entitled to monetary damages and/or other remedies, and if so the nature of any such relief;

m. Whether Land Rover's acts and/or omissions entitle Plaintiffs and the other members of the Class to treble damages, attorneys' fees, prejudgment interest and cost of suit; and

n. Whether Land Rover was unjustly enriched by its acts and/or omissions at the expense of Plaintiffs and the other members of the Class.

124. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class.

Plaintiffs and the other members of the Class have suffered similar injury by the same wrongful

practices by Land Rover. The claims of Plaintiffs and the other members of the Class all arise from the same wrongful practices and course of conduct, and are based on the same legal and remedial theories.

125. **Adequacy Of Representation**: Plaintiffs will fully and adequately assert and protect the interests of the members of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the members of the Class.

126. **Superiority Of Class Action And Impracticability Of Individual Actions**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is not economically feasible and is procedurally impracticable. While the aggregate damages sustained by the members of the Class are in the millions of dollars, and are no less than five million dollars, upon information and belief, the individual damages incurred by each member of the Class resulting from Land Rover's wrongful course of conduct are too small to warrant the expense of individual suits. The likelihood of individual members of the Class prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Land Rover has acted or refused to act on grounds generally applicable to the

members of the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

## VII.    CLAIMS FOR RELIEF

### A.  Claims Brought on Behalf of the New Jersey Subclass

### FIRST COUNT -- MISREPRESENTATION

### (Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.)

127.    Plaintiff Block, on behalf of herself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

128.    Block bring this Count on behalf of the New Jersey Subclass.

129.    Land Rover has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Vehicles it knew to be defective in violation of the New Jersey Consumer Fraud Act ("NJCFA").

130.    Land Rover represented that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

131.    In its advertising, promoting, marketing, distributing, selling and leasing of the Vehicles, Land Rover consciously misrepresented material facts to Block and other members of the New Jersey Subclass that the Vehicles suffer from the Defect and the costs, risks, and diminished value of the vehicles as a result of this defect.

132.    Land Rover intended Block and other members of the New Jersey Subclass would rely upon its acts of misrepresentation by purchasing or leasing the Vehicles at full price rather than paying less to purchase or lease the Vehicles, or purchasing or leasing other vehicles.

133.    Land Rover's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public. The fact that the Defect in the Vehicles would cause the battery to prematurely drain and cause the electrical and/or entertainment systems to not function properly was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

134.    Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

135.    As a direct and proximate result of Land Rover's violations of the NJCFA, Block and other members of the New Jersey Subclass have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend – and will have to expend in the future – to repair and/or replace their vehicles' batteries and/or other components, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

**B. Claims Brought on Behalf of the Nationwide Class**

**SECOND COUNT -- OMISSION**

**(Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.)**

136.    Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

137.    This claim is brought on behalf of the Nationwide Class.

138.    Land Rover has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Vehicles it knew to be defective.

139. Land Rover intentionally omitted the fact that its goods, merchandise and/or services did not have characteristics, uses, benefits, or quantities that were advertised and promoted, and failed to disclose that its goods, merchandise and/or services were not of a particular standard, quality or grade.

140. Land Rover was under a duty to Plaintiffs and the Nationwide Class to disclose the defective nature of the Vehicles and the Defect because:

a. Land Rover was in a superior position to know the true state of facts about the Defect and repair costs in the Vehicles;

b. Plaintiffs and the Nationwide Class could not reasonably have been expected to learn or discover that the Vehicles and their batteries and ICM had dangerous safety defects until after manifestation of the defect;

c. Land Rover knew that Plaintiffs and the Nationwide Class could not reasonably have been expected to learn or discover the Defect and the associated repair costs until the manifestation of the defect; and

d. Land Rover actively concealed the Defect and the repair costs by asserting to Plaintiffs and the Nationwide Class that the cause of their battery problems was due to Plaintiffs and the Nationwide Class's inability to maintain the proper vehicle maintenance despite knowing the cause and need to repair the Defect.

141. In failing to disclose the Defect and the associated risks and repair costs, Land Rover undertook active and ongoing steps to intentionally conceal the Defect, and has concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class with respect to the Defect in the Vehicles.

142. Land Rover intended that Plaintiffs and the other members of the Nationwide Class would rely upon its acts of concealment and/or omission by purchasing or leasing the Vehicles at

full price rather than paying less to purchase or lease the Vehicles, or purchasing or leasing other vehicles.

143.    Land Rover's omissions were objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The fact that Land Rover knew about and failed to disclose that the Defect in the Vehicles was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

144.    Such practices contravene the New Jersey Consumer Fraud Act, <u>N.J.S.A.</u> 56:8-1, et seq.

145.    As a direct and proximate result of Land Rover's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class have suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend – and will have to expend in the future – to repair and/or replace their vehicles' batteries and/or other components, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

## **THIRD COUNT – OVER CHARGING**

### **(Violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, et seq.)**

146.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.    This claim is brought on behalf of the Nationwide Class.

148.    Land Rover has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Vehicles at a premium price despite knowing that they were defective.

149.    Land Rover charged a premium for its ICM system of approximately $5,075 despite knowing that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

150.    Land Rover sets the pricing for the Vehicles at its headquarters in New Jersey.

151.    In its advertising, promoting, marketing, distributing, selling and leasing of the Vehicles, Land Rover undertook active and ongoing steps to charge a premium price for the Vehicles while intentionally concealing the Defect, and has consciously misrepresented, concealed, failed to disclose and/or omitted material facts from Plaintiffs and other members of the Nationwide Class with respect to the Defect.

152.    Land Rover intended that Plaintiffs and the other members of the Nationwide Class would rely upon its acts of misrepresentation, concealment and/or omission by purchasing or leasing the Vehicles at premium price rather than paying less to purchase or lease the Vehicles, or purchasing or leasing other vehicles.

153.    Land Rover's conduct was objectively deceptive, and had the capacity to deceive and defraud reasonable consumers under the circumstances. The fact that Land Rover knew about and failed to disclose the Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

154.    Such practices contravene the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

155.    As a direct and proximate result of Land Rover's violations of the NJCFA, Plaintiffs and the other members of the Nationwide Class have suffered ascertainable losses, which include but are not limited to, the premium price the Nationwide Class paid for the Vehicles, the

monies they were forced to expend – and will have to expend in the future – to repair and/or replace their vehicles' batteries and/or other components, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the NJCFA.

## FOURTH COUNT

### (Common Law Fraud)

156.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

157.    This claim is brought on behalf of the Nationwide Class.

158.    Land Rover consciously and intentionally misrepresented, concealed, failed to disclose and/or omitted a material presently existing or past fact.  For example, Land Rover did not fully and truthfully disclose to their customers the presence of the Defect.  As a result, Plaintiffs and the other members of the Nationwide Class were fraudulently induced to purchase or lease vehicles containing the Defect.

159.    These misrepresentations, concealments and/or omissions were intentionally made by Land Rover with knowledge of their falsity, and with the intent that Plaintiffs and the members of the other members of the Nationwide Class would rely upon them.

160.    Plaintiffs and the other members of the Nationwide Class reasonably relied on Land Rover's misrepresentations, concealments and/or omissions, and suffered damages as a result.

## FIFTH COUNT

### (Unjust Enrichment)

161.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

162.    This claim is brought on behalf of the Nationwide Class.

163.     Defendant's acts and/or omissions allowed them to gain millions of dollars in profits that would not have been gained, but for their wrongful conduct.

164.     Plaintiffs and the other members of the Nationwide Class paid amounts to purchase and lease their vehicles, which they would not otherwise have paid had Land Rover informed them of the presence of the Defect.

165.     Plaintiffs and the other members of the Nationwide Class suffered damages as a result.

166.     Land Rover has been unjustly enriched by the sale and lease of the Vehicles containing the Defect.

167.     Land Rover lacks legal justification for the wrongful acts and/or omissions it undertook at the expense of Plaintiffs and the other members of the Nationwide Class, as alleged herein.

168.     The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Land Rover to retain the benefit of the profits that it unfairly has obtained by selling or leasing the Vehicles to Plaintiffs and the other members of the Nationwide Class.

169.     Plaintiffs and the other members of the Nationwide Class, having been injured by Land Rover's conduct, are entitled to restitution and/or disgorgement of profits as a result of the unjust enrichment of Land Rover to their detriment.

## SIXTH COUNT

### (Breach Of The Covenant Of Good Faith And Fair Dealing)

170.     Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

171.     This claim is brought on behalf of the Nationwide Class.

172.    Every contract contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty, and may be breached even if there is no breach of a contract's express terms.

173.    Land Rover's acts and/or omissions constitute a breach of the covenant of good faith and fair dealing, by consciously misrepresenting, concealing, failing to disclose and/or omitting material facts from Plaintiffs and the other members of the Nationwide Class with respect to the Defect, and by failing to notify Plaintiffs and the other members of the Nationwide Class of the Defect and by failing to fully and properly repair the Defect.

174.    Land Rover acted in bad faith and with a malicious motive to deny Plaintiffs and the other members of the Nationwide Class the benefit of the bargain originally intended by the parties, causing them injury.

175.    As a direct and proximate result of Land Rover's breach of the covenant of good faith and fair dealing, Plaintiffs and the other members of the Nationwide Class have incurred damages.

## SEVENTH COUNT

### (Breach of Express Warranty)

176.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

177.    This claim is brought on behalf of the Nationwide Class.

178.    Land Rover provided all purchasers and lessees of the Vehicles with the express warranties described herein, which became part of the basis of the bargain.

179.    Accordingly, Land Rover warranties are express under state law.

35

180.    The components that must be repaired and/or replaced as a result of the Defect, as well as the other damages caused as a result of the Defect, as described herein, are covered by the express warranties Land Rover provided all purchasers and lessors of the Vehicles.

181.    Plaintiffs and the other members of the Nationwide Class have complied with all obligations and requirements under the Vehicles' express warranties, or are otherwise excused from performance of said obligations and requirements.

182.    Land Rover breached these warranties by selling and leasing Vehicles which they knew, or reasonably should have known, contained the Defect and required repair or replacement within the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods.

183.    Plaintiffs notified Land Rover of the breach within a reasonable time, and/or was not required to do so because affording Land Rover a reasonable opportunity to cure its breach of written warranty would have been futile. Land Rover also knew of the defect and yet have chosen to conceal it and to not comply with their warranty obligations.

184.    As a direct and proximate result of Land Rover's breach of the Vehicles' express warranties, Plaintiffs and the other members of the Nationwide Class were damaged by, among other things, being forced to expend monies – and will continue to be forced to expend monies – to repair and/or replace their vehicles' components, and diminution in value of their vehicles.

185.    Land Rover's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Land Rover's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the Defect.

186.    The time limits contained in Land Rover's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Nationwide Class. Among

36

other things, Plaintiffs and the other members of the Nationwide Class had no meaningful choice in determining these time limitations the terms of which unreasonably favored Land Rover. A gross disparity in bargaining power existed between Land Rover and Plaintiffs and the Nationwide Class, and Land Rover knew or should have known that the Vehicles were defective at the time of sale and would fail well before their useful lives.

187. Plaintiffs and members of the Nationwide Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Land Rover's conduct described herein.

## EIGHTH COUNT

### (Breach of Implied Warranty)

188. Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

189. This claim is brought on behalf of the Nationwide Class.

190. Land Rover was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Vehicles. Land Rover knew, or reasonably should have known, of the specific use for which the Vehicles were purchased or leased.

191. Land Rover provided Plaintiffs and the other members of the Nationwide Class with an implied warranty of merchantability that the Vehicles, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold.

192. Land Rover impliedly warranted that the Vehicles were of merchantable quality and fit for such use. This implied warranty of merchantability included, among other things: (1) a warranty that the Vehicles, their batteries, and their electrical systems, including the ICM, were manufactured, supplied, distributed, sold and/or leased by Land Rover were safe and reliable for providing transportation, and would not experience premature battery failure; and (ii) a warranty

that the Vehicles, their batteries, and their electrical systems would be fit for their intended use while the vehicles were being operated.

193.    Contrary to the applicable implied warranties of merchantability, the Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and the other members of the Nationwide Class with reliable, durable, and safe transportation.

194.    Defendant breached the Vehicles' implied warranty of merchantability by selling or leasing Plaintiffs and the other members of the Nationwide Class vehicles, and/or components thereof, that are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Vehicles suffered from the Defect at the time of sale rendering the Vehicles unfit for their particular purpose of providing safe and reliable transportation.

## NINTH COUNT

**(Breach of Written Warranty Under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 230 *et seq.*)**

195.    Plaintiffs, on behalf of themselves and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

196.    This claim is brought on behalf of the Nationwide Class.

197.    Plaintiffs and other members of the Nationwide Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

198.    Land Rover is a "supplier[]" and "warrantor[]" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

199.    The Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

200.    Land Rover's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

201. Land Rover breached the express warranty by selling and leasing vehicles which they knew, or reasonably should have known, contained the Defect and required repair or replacement within the applicable warranty periods, and/or refused to honor the warranties by providing free repairs and/or replacements during the applicable warranty period or periods.

202. Land Rover's breach of the express warranty deprived the Plaintiffs and the other members of the Nationwide Class of the benefits of their bargains.

203. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

204. Land Rover has been afforded a reasonable opportunity to cure its breach of written warranty, including when Plaintiffs and other members of the Nationwide Class brought their vehicles in for diagnoses and repair of the Defect.

205. As a direct and proximate result of Land Rover's breach of written warranty, Plaintiffs and other members of the Nationwide Class sustained damages and other losses in an amount to be determined at trial. Land Rover's conduct damaged Plaintiffs and other members of the Nationwide Class who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## C. Claims Brought on Behalf of the Massachusetts's Subclass

### TENTH COUNT

### (Violations of Massachusetts's Consumer Protection Law, Mass. Gen. L. Chapter 93.)

206. Manakin, on behalf of herself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

207.    This Claim is brought on behalf of the Massachusetts Subclass.

208.    Land Rover has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Vehicles it knew to be defective.

209.    Land Rover represented that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

210.    In its advertising, promoting, marketing, distributing, selling and leasing of the Vehicles, Land Rover undertook active and ongoing steps to intentionally conceal the Defect, and has consciously misrepresented, concealed, failed to disclose and/or omitted material facts from Manakin and the other members of the Massachusetts Subclass with respect to the Defect in the Vehicles.

211.    Land Rover intended that Manakin and the other members of the Massachusetts Subclass would rely upon its acts of misrepresentation, concealment and/or omission by purchasing or leasing the Vehicles at full price rather than paying less to purchase or lease the Vehicles, or purchasing or leasing other vehicles.

212.    Land Rover's conduct was objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The existence of the Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

213.    Such practices contravene the MA CPL.

214.    As a direct and proximate result of Land Rover's violations of the Massachusetts Consumer Protection Law, Manakin and the other members of the Massachusetts Subclass have

suffered ascertainable losses, which include but are not limited to, the monies they were forced to expend – and will have to expend in the future – to repair and/or replace their vehicles' batteries and/or other components, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the MA CPL.

**D. Claims Brought on Behalf of the California Subclass**

**<u>ELEVENTH COUNT</u>**

**<u>(Violations of Cal. Bus. & Prof. Code § 17200 *et seq.*)</u>**

215.    Fematt, on behalf of herself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

216.    This claim is brought on behalf of the California Subclass.

217.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *etseq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

218.    Land Rover has engaged in deceptive, unconscionable, unfair, fraudulent and/or misleading commercial practices in the advertising, promoting, marketing, distributing, selling and leasing of the Vehicles it knew contained the Defect.

219.    Land Rover's conduct constitutes unfair business acts and/or practices because Land Rover's practices have caused and are likely to cause substantial injury to Fematt, and others similarly situated, which injury was not reasonably avoidable by Fematt in light of Land Rover's exclusive knowledge of the Defect and is not outweighed by the acts' and practices' benefits, if any, to Fematt and the other members of the California Subclass.  Such conduct is ongoing and continues to this date.

220.    The injury to consumers is substantial, particularly because the Vehicles were defective at the time of sale.  Fematt and the other members of the California Subclass paid additional money for Vehicles that were not as represented and they would not otherwise have spent for Vehicles that were neither dependable nor safe. The Vehicles are worth less than Fematt and the other members of the California Subclass paid for them given the Defect.  The injury to consumers is not outweighed by any countervailing benefits to consumers or competition.  Any purported benefits to consumers from the design of the Vehicles are negated by the Defect.

221.    The injury to consumers is not an injury that consumers themselves could reasonably have avoided because consumers did not know about the Defect.

222.    Land Rover's acts and practices of intentional selling Vehicles with the Defect is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

223.    It is unethical and oppressive to charge a premium price for a product that cannot be depended upon and could risk serious injury or death because of the Defect. Further, as alleged in detail above, Land Rover actually knew about the existence of the Defect which renders Land Rover's conduct particularly deceptive, immoral, unethical, oppressive and unscrupulous.

224.    Land Rover's acts, omissions, and practices are fraudulent in that they have deceived and/or are "likely to deceive" Fematt and members of the California Subclass.  Land Rover sold Fematt and the other members of the California Subclass vehicles with the Defect that have rendered those vehicles unsafe and unreliable, thus defeating the very purpose for which these vehicles were purchased.

225.    Fematt and the other members of the California Subclass relied on Land Rover's unfair, unlawful, and fraudulent business acts and practices to their detriment in that they would not have purchased the Vehicles had Land Rover disclosed the Defect. As alleged herein, Fematt

42

relied on Land Rover's representations of safety and reliability and would not have bought her vehicle had Land Rover disclosed the Defect.

226.   Land Rover was obliged to disclose the material facts because: a) Land Rover had exclusive superior knowledge of the material facts not known to Fematt and the other members of the California Subclass, since only Land Rover had access to the data from its manufacturers, its own research and tests, and  other information it obtained and or recorded; and b) Land Rover actively concealed and suppressed the material facts from Fematt and the other members of the California Subclass by not revealing the Defect when it knew it would not cure the malfunctioning Vehicles, while representing to consumers either expressly or impliedly that there were no reliability or safety problems with the Vehicles' electrical systems and battery; (c) Land Rover made  representations about the Vehicle's  "safe," "reliable," and "durable" performance while withholding the material fact that the Vehicles contained the Defect.

227.   Fematt and the other members of the California Subclass have suffered injury in fact and have lost money as a result of Land Rover's unfair competition in that they have overpaid for the Vehicles and/or by the fact that their vehicles are worth less than they paid for them because of the Defect.  Fematt and the other members of the California Subclass seek an order of this Court awarding restitution, injunctive relief and all other relief allowed under the UCL, plus interest, attorneys' fees, and costs.

## TWELFTH COUNT

### (Violations of the California Consumers Legal Remedies Act,

### Cal. Civ. Code § 1750 *et seq.*)

228.   Fematt, on behalf of herself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

229.   This claim is brought on behalf of the California Subclass.

230.    Fematt seeks to enjoin Land Rover's violation of the CLRA, as well as damages resulting from Defendant's violations of the CLRA.

231.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

232.    At all times relevant hereto, Fematt and the other members of the California Subclass were "consumer[s]" as that term is defined in Civ. Code § 1761(d).

233.    At all times relevant hereto, the Vehicles constituted "goods" as that term is defined in Civ. Code §1761(a).

234.    At all times relevant hereto, Land Rover constituted a "person" as that term is defined in Civ. Code §1761(c).

235.    At all times relevant hereto, Fematt and the other members of the California Subclass' purchases of their vehicles constituted "transactions" as that term is defined in Civ. Code §1761(e).

236.    At all times relevant hereto, Defendant provided "services" to Fematt and the other members of the California Subclass within the meaning of Civil Code §1761(b).

237.    Land Rover violated the CLRA, including at least Civ. Code § 1770(a) subsection (5), (7), and (9):

      a.  Cal. Civ. Code § 1770(a)(5): Representing that goods have characteristics, uses, and benefits which they do not have;

      b.  Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

      c.  Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as

advertised; and

d.   Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in

accordance with a previous representation when they have not.

238.   Fematt and the other members of the California Subclass would have behaved

differently by not buying the Vehicles, not paying for repairs, and/or paying less for the Vehicles,

had they been aware of the Defect.

239.   The misrepresentations and omissions of material facts, as alleged above, are

contrary to representations actually made by Land Rover.

240.   Land Rover was obliged to disclose the material facts because: a) Land Rover had

exclusive superior knowledge of the material facts not known to Fematt and the other members of

the California Subclass, since only Land Rover had access to the data from its manufacturers, its

own research and tests, and  other information it obtained and or recorded; and b) Land Rover

actively concealed and suppressed the material facts from Fematt and the other members of the

California Subclass by not revealing the Defect when it knew would not cure the malfunctioning

Vehicles, while representing to consumers either expressly or impliedly that there were no

reliability or safety problems with the Vehicles' electrical systems and battery; (c) Land Rover

made  representations about the Vehicle's  "safe," "reliable," and "durable" performance while

withholding the material fact that the Vehicles contained the Defect.

241.   Fematt and the other members of the California Subclass justifiably acted or relied

to their detriment upon the concealment and/or non-disclosure of material facts as evidenced by

their purchases of the defective Vehicles.  Had defendant disclosed the material fact that the

Vehicles had the Defect, Fematt and the other members of the California Subclass would have

behaved differently by not buying the Vehicles or paying less for them.

242.     Land Rover's misrepresentations and omissions of material facts directly and proximately caused Fematt's and the other members of the California Subclasses injuries in that Fematt and the other members of the California Subclass would not have paid the extra premium for the Vehicles or would not have bought the Vehicles at all had Defendant disclosed that the Vehicles contained the Defect. As such, Fematt and the other members of the California Subclass did not receive the benefit of the bargain.

243.     Civil Code §1780 (a)(2) permits any court of competent jurisdiction to enjoin practices that violate Civil Code § 1770.

244.     Civil code §1780(a) subsections (1) and (2) permit a court of competent jurisdiction to award damages and restitution.

245.     Fematt has provided Land Rover with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a). The notice was transmitted to Land Rover on July 15, 2016.

246.     As a result of Land Rover's violations of the CLRA, Fematt and the other members of the California Subclass are entitled to an Order (1) enjoining the wrongful practices described above; (2) requiring repairs or replacement of the Vehicles; (3) costs; (4) attorney's fees, and (5) such other relief as the Court deems just permitted by Civil Code § 1780 (a) and (e).

## THIRTEENTH COUNT

### (Breach of Implied Warranty of Merchantability under

### the Song-Beverly Act, Cal. Civ. Code 1790 *et seq*.)

247.     Fematt, on behalf of herself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

248.     This claim is brought on behalf of the California Subclass.

249.     Under California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792 *et seq*., every sale of consumer goods is accompanied by both a "manufacturer's and retailer's"

implied warranty that the goods are merchantable within the meaning of Cal. Civ. Code § 1791.1(a). Therefore, consumers need not be in privity with the manufacturer to bring an implied warranty claim.

250.    The Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

251.    Defendant is a "manufacturer" within the meaning of Cal. Civ. Code §§ 1791(j).

252.    Fematt bought her vehicle at retail in the State of California.

253.    At the time of sale, and currently, Land Rover is in the business of manufacturing, marketing, and selling the Vehicles.

254.    By operation of law, Land Rover impliedly warranted to Fematt and the other members of the California Subclass that the Vehicles, for which Fematt and the other members of the California Subclass paid a premium price, were of merchantable quality and fit for the ordinary purposes for which they are used.

255.    Land Rover knowingly and/or recklessly sold a defective product without conspicuously informing consumers about the Defect.

256.    Land Rover knew of the Defect from its own internal analysis as well as through customer complaints.

257.    Land Rover breached the implied warranty at the time of sale by selling the Vehicles with the Defect.

258.    Fematt and the other members of the California Subclass were the intended third-party beneficiaries of the contracts for sale of the Vehicles from Land Rover to the auto dealers who ultimately sold the Vehicles to Fematt and the other members of the California Subclass.

259.    Land Rover knew that the auto dealers to whom it sold the Vehicles were not going to own the Vehicles any longer than it took to sell them to Fematt and the other members of the

California Subclass.  Further, Land Rover intended that any warranty, whether express or implied, that applied to the Vehicles were for the benefit of Fematt and the other members of the California Subclass; who are the people that the auto dealers and Land Rover intended and knew would own and use the Vehicles for their intended purposes.

260.    Land Rover knew and intended that Fematt and the other members of the California Subclass were the ultimate beneficiaries of Land Rover's implied warranties as they are the owners/lessees of the Vehicles.

261.    Fematt and the other members of the California Subclass purchased or leased the Vehicles from authorized dealers who are agents of Land Rover.

262.    Land Rover brought itself into privity with Fematt and the other members of the California Subclass who relied on written labels, representations, and advertisements made by Land Rover as alleged herein.

263.    As a direct and proximate result of Land Rover's breach of implied warranty, Fematt and the other members of the California Subclass have sustained damages and other losses in an amount to be determined at trial.  Fematt and the other members of the California Subclass are entitled to recover damages and attorneys' fees as provided by statute, as well as costs, and other relief the Court deems appropriate.

**E.  Claims Brought on Behalf of the Maryland Subclass**

**FOURTEENTH COUNT**

**(Violation of Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-301, *et seq*.)**

264.    Hunter, on behalf of himself and all others similarly situated, incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

265.    Hunter and other members of the Maryland Subclass are consumers within the meaning of the MD CPA.

266.    The Vehicles are consumer goods within the meaning of the MD CPA and Land Rover provided services within the MD CPA's meaning of the term consumer services.

267.    The MD CPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

268.    Land Rover violated the MD CPA by, among other things, engaging in the following unfair deceptive acts or practices.

269.    Land Rover represented that its goods, merchandise and/or services had characteristics, uses, benefits, or quantities that they did not have, and that its goods, merchandise and/or services were of a particular standard, quality or grade that they were not.

270.    In its advertising, promoting, marketing, distributing, selling and leasing of the Vehicles, Land Rover undertook active and ongoing steps to intentionally conceal the Defect, and has consciously misrepresented, concealed, failed to disclose and/or omitted material facts from Hunter and other members of the Maryland Subclass with respect to the Defect in the Vehicles.

271.    Land Rover intended that Hunter and other members of the Maryland Subclass would rely upon its acts of misrepresentation, concealment and/or omission by purchasing or leasing the Vehicles at full price rather than paying less to purchase or lease the Vehicles, or purchasing or leasing other vehicles.

272.    Land Rover's conduct was objectively deceptive, and had the capacity to deceive reasonable consumers under the circumstances. The existence of the Defect was a material fact that a reasonable and/or unsophisticated consumer would attach importance to at the time of purchase or lease. This fact would influence a reasonable consumer's choice of action during the purchase or lease of a vehicle.

273.     As a direct and proximate result of Land Rover's violations of the MD CPA, Hunter and other members of the Maryland Subclass have suffered an fact and/or actual damage, which include but are not limited to, the monies they were forced to expend – and will have to expend in the future – to repair and/or replace their vehicles' batteries and/or other components, the diminished value of their vehicles, and the failure to receive the benefit of their purchases or leases, and accordingly were harmed by Defendants' actions in violation of the MD CPA.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs on behalf of themselves and on behalf of the Nationwide Class, New Jersey Subclass, California Subclass, Massachusetts Subclass and Maryland Subclass, prays for judgment against Jaguar Land Rover North America, LLC granting the following relief:

1.     Certification of the proposed Nationwide Class, New Jersey Subclass, California Subclass, Massachusetts Subclass and Maryland Subclass and appointing Plaintiffs to represent the Classes and Plaintiffs' counsel as class counsel;

2.     All recoverable compensatory and other damages sustained by Plaintiffs and the other members of the Nationwide Class, New Jersey Subclass, California Subclass, Massachusetts Subclass and Maryland Subclass;

3.     Restitution and disgorgement of all amounts obtained by Land Rover as a result of its misconduct, together with interest thereon, from the date of payment, to the victims of such violations;

4.     Actual, treble, and/or statutory damages for injuries suffered by Plaintiffs and the other members of the Classes in the maximum amount permitted by applicable law;

5.     An Order: (1) requiring Land Rover to immediately cease its wrongful conduct, as set forth above; (2) enjoining Land Rover from further wrongful practices concerning the distribution, advertisement, marketing, warranting, sale and lease of the Vehicles; (3) requiring

Land Rover to make all repairs and/or replacements necessitated as a result of the Defect in the vehicles purchased or leased by Plaintiffs and the other members of the Nationwide Class, New Jersey Subclass, California Subclass, Massachusetts Subclass and Maryland Subclass; (4) requiring Land Rover to refund to Plaintiffs and all members of the Nationwide Class, New Jersey Subclass, California Subclass, Massachusetts Subclass and Maryland Subclass the funds they were forced to expend on repairs and/or replacements as a result of the Defect; and (5) a declaration that Land Rover is financially responsible for notifying all members of the Nationwide Class, New Jersey Subclass, California Subclass, Massachusetts Subclass and Maryland Subclass of the defective nature of the electronic and/or entertainment systems and battery, recalling the Vehicles and/or extending their warranties to cover the Defect;

6.      Statutory pre-judgment and post-judgment interest on the Class damages;

7.      Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

8.      Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all causes of action so triable.

**DATED:** July 15, 2016                    **NAGEL RICE, LLP**
                                            *Attorneys for Plaintiffs and the Putative Class*


                                            By:   __s/ *Bruce H. Nagel*___
                                                  Bruce H. Nagel
                                                  103 Eisenhower Parkway
                                                  Roseland, New Jersey 07068
                                                  973-618-0400
                                                  bnagel@nagelrice.com